1  P. STERLING KERR, ESQ.
   Nevada Bar No. 3978
2  GEORGE E. ROBINSON, ESQ.
   Nevada Bar No. 9667
3  KERR SIMPSON ATTORNEYS AT LAW
   2900 W. Horizon Ridge Parkway, Suite 200
4  Henderson, Nevada 89052
   Telephone No. (702) 451–2055
5  Facsimile No. (702) 451-2077
   Email: sterling@kerrsimpsonlaw.com
6  Email: george@kerrsimpsonlaw.com

7  CARRIE GOLDBERG, *Pro hac vice* To be filed
   C. A. GOLDBERG, PLLC
8  16 Court Street, 33rd Fl.
   Telephone No. (646) 666-8908
9  Email: carrie@cagoldberglaw.com
   *Attorneys for Plaintiff*

10

                **UNITED STATES DISTRICT COURT**
11                 **DISTRICT OF NEVADA**

12 MELISSA HUTCHISON aka              )    Case No.: 2:24-CV-00673-
   PHOENIX MARIE, an individual,      )    GMN-BNW
13 Plaintiff,                         )
                                      )
14 v.                                 )    **FIRST AMENDED**
                                      )    **COMPLAINT**
15 ETHICAL CAPITAL PARTNERS, a foreign)
   entity; AYLO PREMIUM LTD., a foreign)  1)  BREACH OF CONTRACT;
16 corporation; DM PRODUCTIONS, a foreign) 2)  BREACH OF THE DUTY OF
   entity; DIGITAL PLAYGROUND, a foreign)      GOOD FAITH AND FAIR
17 entity; MIND GEEK USA INCORPORATED,)        DEALING
   a foreign entity; MG PREMIUM LTD,  )    3)  SEXUAL BATTERY
18 a foreign entity; DM PRODUCTIONS,  )    4)  BATTERY
   a foreign entity; DIGITAL PLAYGROUND,)  5)  INTENTIONAL
19 a foreign entity; DANNY MARTIN aka )        INTERFERENCE WITH
   DANNY D, an individual;           )        CONTRACTUAL
20 FRANK PETOSA an individual;        )        RELATIONS
   RYAN HOGAN, an individual;        )    6)  INTENTIONAL
21 MICHAEL WOODSIDE, an individual;   )        INTERFERENCE WITH
   and DOES 1 through 50.             )        PROSPECTIVE
22 Defendants.                        )        ADVANTAGE
                                           7)  INTENTIONAL INFLICTION
23                                             OF EMOTIONAL DISTRESS
                                           8)  DEFAMATION PER SE
24                                         9)  CIVIL CONSPIRACY

25

                        Page **1** of 26

COMES NOW, Plaintiff by and through her attorneys, KERR SIMPSON ATTORNEYS AT LAW, complains and alleges against Defendants as follows:

1. This is a case about some of biggest names in pornography abdicating all responsibility for on-set safety. When a violent medical emergency with another adult actress transpired on-set, Plaintiff Melissa Hutchison, was the only one who responded with safety in mind.

2. After the distressing emergency, producers violated industry-wide standard of care by forcing everybody to continue filming an orgy scene and never conducting a proper investigation into the crisis.

3. Worried that he or his girlfriend could be blamed for causing the medical emergency, the director (and lead actor) of the shoot unfurled an elaborate plan for Hutchison to take the fall, claiming falsely that Hutchison had provided lithium to the actor who became violently ill.

4. As a result of Defendants' scorched earth campaign to destroy her hard-earned career – resulting in her being blackballed within the industry and the algorithmic suppression of her  archives of online content, Plaintiff has suffered severe and pervasive reputational, emotional, and financial harm.

**PARTIES**

5. Plaintiff Melissa Hutchison aka Phoenix Marie ("Plaintiff" or "Hutchison") is an individual and resident of Clark County, Nevada.

6. Defendant Ethical Capital Partners is a foreign corporation doing business in Clark County, Nevada.

7.  Defendant Aylo Premium Ltd. ("Aylo") is a foreign corporation doing business in Clark County, Nevada.

8.  Defendant MindGeek USA Incorporated ("MindGeek") is a corporation organized and existing in the state of Delaware and doing business in Clark County, Nevada.

9.  Defendant MG Premium LTD dba Brazzers ("Brazzers") is a business entity of unknown origin and doing business in Clark County, Nevada.

10. Defendant DM Productions is a business entity of unknown origin and doing business in Clark County, Nevada.

11. Defendant Digital Playground  is a business entity of unknown origin and doing business in Clark County, Nevada.

12. Defendant Frank Petosa is an individual and resident of Quebec, Canada.

13. Defendant Ryan Hogan is an individual and resident of Quebec, Canada.

14. Defendant Michael Woodside is an individual and resident of Quebec, Canada.

15. Defendant Danny Martin ("Danny D") is an individual and resident of London, England.

16. The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants named herein as Does 1 through 50, inclusive, are unknown to Plaintiff at this time and therefore said Defendants are sued by such fictitious names. Plaintiff will seek leave to amend this Complaint to insert the true names and capacities of said Defendants when the same become known to Plaintiff. Plaintiff is informed and believes, and based thereupon alleges, that each of the fictitiously named Defendants is responsible for the wrongful acts alleged herein, and is therefore liable to Plaintiff as alleged hereinafter.

**ALTER EGO, AGENCY AND JOINT EMPLOYER**

17. Upon information and belief, the business affairs of Defendants ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL

PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50 are, and at all times relevant hereto were, so mixed and intermingled that the same cannot be reasonably be segregated, and the same are in inextricable confusion. ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50 were at all times relevant hereto was, used by each other, as a mere shell and conduit for the conduct of certain of Defendants' affairs, and is, and was, the alter ego of each other. The recognition of the separate existence of ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50 would not promote justice, in that it would permit Defendants to insulate themselves from liability to the Plaintiff. The corporate existence of ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50 should be disregarded in equity and for the ends of justice because such disregard is necessary to avoid fraud and injustice to Plaintiff.

18. Accordingly, ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50 constitute the alter egos of each other, and the fiction of their separate existence must be disregarded.

19. ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50, together with various others, supervised Plaintiff's work and exercised control over Plaintiff and her work and, thus, also completely dominated and controlled Plaintiff's performance of her employment duties.

20. As a result of the aforementioned facts, Plaintiff is informed and believes, thus based thereon alleges that ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50 are Plaintiff's joint employers by virtue of a joint enterprise, and that Plaintiff was a contracted employee of ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50.

21. Plaintiff performed services for ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50, and to the mutual benefit of ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD, DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50, and ETHICAL CAPITAL PARTNERS, AYLO PREMIUM LTD., DM PRODUCTIONS, DIGITAL PLAYGROUND, MIND GEEK USA INCORPORATED, MG PREMIUM LTD, DM PRODUCTIONS, and DIGITAL PLAYGROUND and Does 1 through 50

shared control of Plaintiff as a contracted actor either directly or indirectly, and the manner in which their business was and is conducted.

## JURISDICTION AND VENUE

22. Jurisdiction is proper as the parties conduct business in and have sufficient contacts with the State of Nevada as they sell millions of dollars' worth of pornographic materials in the State of Nevada and attend and promote large conventions in the State of Nevada.

23. Venue is proper in Clark County, Nevada as most of the contacts occur in Clark County, Nevada.

## FACTUAL BACKGROUND

24. Aylo (formerly Manwin, Mansef, and Mindgeek) is an adult entertainment conglomerate owned by Canadian private equity firm, Ethical Capital Partners.

25. Aylo is primarily involved in internet pornography, operating a number of video sharing websites (including platforms such as Pornhub, RedTube, YouPorn, Trans Angels, and XVideos), and pornographic film studios such as Brazzers, Digital Playground, Men.com, Reality Kings, Bang Bros, Sean Cody, and WhyNotBi.com, among others. Aylo's headquarters are located in Montreal, Quebec, Canada, but the company's corporate structure is divided among entities domiciled in a number of other countries (including tax havens such as Curaçao and Luxembourg).

26. The company is one of the largest distributors of online pornography, controlling an estimated 90% of all production and distribution of content, to the extent that it has a monopoly position, providing it with the ability to cause significant damage to actors' reputations or earning power with minimal effort.

27. Aylo purports to be concerned about the safety of its adult performers. For instance, Aylo requires its performers sign the mandatory Aylo Pre Shoot Discussion and Boundaries Checklist, a document outlining an actor's varying degrees of consent that

explicitly states "Safety is our top priority on each production," "Producers must make sure to address needs and comfort levels actively during filming, not just before and after the scene," "Producers must pause and adjust if and when Performer(s) express any emotional or physical discomfort," and "Performer needs to clearly communicate any concerns before the scene and during the scene directly or by using agreed upon non-verbal signals and safe words with scene partner and Producer."

28. As a further safety measure, Aylo's policy on every location and shoot is for a second camera (i.e. a "safety camera") to continuously record behind-the-scenes footage during porn shoots.  The recording continues even after a scene is finished.

29. Plaintiff Melissa Hutchison has been an adult performer for about 18 years.

30. Under the screen name of Phoenix Marie, Hutchison has entered into numerous written agreements to work with the Defendants' companies, subsidiaries, and predecessors to perform in adult films and attend adult-themed events and expositions.

31. For 18 years, Hutchison has been one of the most prolific and popular stars in the industry, the only adult actor in every single industry hall of fame, and believed to be the highest continually paid star. Her performances have made Defendant companies in excess of tens of millions of dollars.

32. Hutchison is also a medical professional with Emergency Medical Technician training. She has worked as a medical assistant in a doctor's office focused on sexual wellness and hormone replacement therapy for 9.5 years and has continued education with one of the top plastic surgeons in the U.K. for 3 years.

33. She is very concerned and passionate about female sexual health.

34. As a veteran of the adult film industry, she tries to educate and assist the younger actresses about sexual health issues whenever she can.

35. Throughout the years, Hutchison witnessed multiple questionable events and activities, but has always been an outspoken advocate in protecting the companies she was working for, even as she opposed some of these events to company leadership behind closed doors.

36. In early October of 2023, Aylo executives met with Hutchison in Montreal to discuss the plans they'd mapped out for her for 2024, including but not limited to 12 months of video shoots, events, and awards, as well as using her as a cover model for the Brazzers 20th anniversary marketing materials and events. They also told her she would be receiving a Brand Ambassador award at the 2024 AVN Awards. It was clearly indicated that Aylo planned both to fulfill her current contract and renew for an additional year.

The Barcelona Shoot

37. In October of 2023, following the planning meeting in Montreal, Hutchison traveled to Barcelona to shoot scenes for Danny D. and Digital Playground to perform with Danny D., Cherie DeVille and others.

38. The main actors were staying in the same residence along with some of the other staff needed for the shoot.

39. In addition to his role as an actor, Danny D. was also the director and producer of the shoot, responsible both for ensuring the safety of everyone on set and ensuring compliance with the rules and regulations set by Aylo for protocol on set.

40. Danny D. was at the Barcelona shoot with his partner, Liss, who was also the makeup artist, the production manager, and the talent assistant (a role that includes advocating for and protecting the actors, particularly if they're uncomfortable with a request from the director).

41. During downtime at the residence, Liss confided to Hutchison that she was dealing with depression tied to her relationship with Danny D., including his sexual intercourse with numerous other partners, both as an adult actor and casually, with no formal commitment to her.

42. Liss made known to Hutchison that she had lithium on set that she claimed she had purchased and was taking to self-medicate for her depression related to Danny D. Liss implied she was not prescribed the medication by a doctor or other medical professional.

43. One of the other actors staying in the residence was a young female with the screen name Zaawaadi.

44. During this shoot, Zaawaadi was slated to to perform her first anal sex scene and informed Hutchison prior to the scene that she had ingested 3 pills of the anti-diarrheal drug Imodium to avoid passing stool during the scene.

45. She told Zaawaadi prior to her anal scene that Imodium could be harmful, and that taking three, which is higher than the recommended dose, could cause dehydration and other complications, especially when combined with drinking alcohol, which Zaawaadi and several of the other actors had done the night before.

46. Hutchison offered Zaawaadi 2 natural probiotic pills and 2 homeopathic laxative pills called Senokot to help counter the ingestion of the 3 Imodium pills and restore gut health.

47. Hutchison told Zaawaadi that these over-the-counter supplements might prevent issues associated with anal sex like tearing, yeast infections, and bowel obstructions if taken after the scene.

48. On the final day of shooting, Hutchison was performing in an orgy scene by the pool with Danny D. and the remaining female actresses, not including Zaawaadi.

49. In the middle of the scene, Liss came out of the house screaming "Emergency, Emergency! She can't breathe."

50. Hutchison, with her medical background and E.M.T. training, immediately left the scene mid-shoot and ran into the house.

51. Zaawaadi was in the house lying on the couch, fully clothed having a medical emergency. She was shaking violently and uncontrollably and screaming that she couldn't breathe. Hutchison grabbed Zaawaadi's face and pulled it right next to hers and comforted her by telling her that if she could speak, she was breathing. She told her to take a long breath out.

52. Hutchison yelled for someone to call an ambulance, and then started administering emergency care.

53. Hutchison tried to keep Zaawaadi calm to regulate her breathing while she evaluated her, video-called Zaawaadi's sister to obtain medical history, and determined based on symptoms and responses that Zaawaadi's seizure was neurological in nature.

54. Zaawaadi continued to shake and have difficulty breathing — typical symptoms of a seizure or neurological episode — and eventually began vomiting. Hutchison focused on regulating Zaawaadi's vitals and trying to control her upper body from flailing and causing further injury.

55. While on the video call with her sister, Hutchison asked Zawaadi if she had taken any drugs or medicines lately, and she said, "only the 4 pills you gave me." Hutchison thought to herself that the natural supplements she had given Zaawaadi would not have caused this reaction and could not find traces of them in her vomit, which Hutchison was collecting for the paramedics.

56. Hutchison cared for Zaawaadi with her sister remaining on the phone for more than an hour. Nobody else on the set took any action to help, seemingly concerned about the

optics. Danny D., who was directly in charge of the set, refused to call for the ambulance and directed the others not to call for one. Only when it became clear Zawaadi's medical emergency was life-threatening did he finally relent and permit an ambulance to be called.

57. After this traumatic medical emergency, as paramedics were carrying her out of the house, Zaawaadi verbally requested Hutchison to travel with her in the ambulance. Danny D. forcibly grabbed Hutchison and forbade her from leaving the set, demanding that she finish the scene immediately because he was worried he would lose daylight for shooting.

58. Hutchison was extremely upset and in shock, worried about whether Zaawaadi would survive. She pleaded with Danny D. to shoot the scene at another time.  She made it unquestionably clear both to Danny D. and his partner Liss, the talent assistant tasked with protecting performers from shooting scenes against their wills, that she did not want to continue.

59. Danny D. coerced Hutchison into completing the scene against her will, in clear contradiction of Aylo policies, including the mandatory Aylo Pre Shoot Discussion and Boundaries Checklist, which everybody had signed.

60. After the traumatic experience of shooting the scene, a scene that involved Danny D. degrading and humiliating her, Hutchison remained very distraught at how the situation with Zaawaadi had been managed and how she was forced by Danny D. to have sex despite repeatedly saying no.

61. Hutchison also was deeply concerned about Zaawaadi's well-being but when she said she wanted to go to the hospital to check on Zaawaadi, Danny D. told her that she could not go. Hutchison had no means of independent transportation or information about

which hospital Zaawaadi had been taken to and was unable to go around Danny D. Hutchison immediately retired to her room for the rest of the evening.

62. Early the next morning, Danny D. claimed that the police had come to the home late at night and forced him to go to the hospital. Hutchison, who was unable to sleep given the trauma of the afternoon, and whose room was right by the front door, had not seen or heard any indication of guests, including police.

63. That next day after the purported visit by law enforcement, Danny D. suddenly was fixated on the optics of "the story." By this point, Danny D. was openly hostile toward Hutchison. At one point that morning Danny D. again forcefully grabbed Hutchison and pulled her into her room, this time throwing her onto the floor and saying "we need to get our story straight." He admitted that, although nearly 24 hours after the incident, he had still not reported Zaawaadi's hospitalization and his assault of Hutchison to the corporate office.

64. Danny D. demanded that Hutchison show him the pills she gave Zaawaadi, taking pictures of the homeopathic probiotics and laxatives, as well as their bottles.

65. He then told Hutchison that Zaawaadi had "gone mad," overdosed on lithium and was in a medically-induced coma, and shared a video of Zaawaadi thrashing around and convulsing on the hospital bed. Danny then asked her if there were any other medications she was taking and demanded to see them.

66. Hutchison told Danny D. she was not taking lithium and didn't have lithium, showing him all of her medications to confirm. She then turned to Liss, who had followed them into the room, and said, "You're taking lithium, did Zaawaadi take yours?" Liss denied that she was taking lithium, despite having just confided it to Hutchison when they arrived on set and having her pills out on the counter in the common area of the house.

67. It began to dawn on Hutchison that "the story" Danny D wanted to get "straight" was one where Danny D. and Liss intended to pin Zaawaadi's lithium reaction on Hutchison.

68. Hutchison suggested that everyone get their blood tested for the presence of lithium, a suggestion she repeated throughout her encounters with the Defendants. Not surprisingly, the others did not support this idea.

69. Despite not finding any lithium in Hutchison's possession and being informed that his partner Liss had lithium in the house, Danny D. knowingly began to advance a false narrative that Hutchsion had poisoned and almost killed Zaawaadi, making her a scapegoat when in fact she had saved Zaawaadi's life, even as he refused to call for an ambulance.

70. With Zaawaadi in a critical medical state, Danny D. was protecting his partner Liss from a potential investigation into Zaawaadi's death by lithium poisoning and shifting the focus away from his repeated mismanagement of the shoot and the medical crisis the previous day.

71. Furthermore, Danny D. knew that Hutchison had been through a horrible event a few years earlier when her 18-year-old daughter died of cancer. Danny D. could tell everyone that it must have been Hutchison who had the lithium because of depression caused by the death of her daughter. Ironically, Hutchison had helped Danny D. treat his own depression and suicidal ideations, which he has talked about publicly.

<u>The Adult Convention in Berlin</u>

72. The next day, despite Zaawaadi still in the hospital in a coma, everyone at the Barcelona shoot was required to flu to Berlin to attend an adult convention where many performers and executives would be present. Danny D. and Liss refused to give Hutchison her flight information or plane ticket, waiting until they arrived at check-in to scan her ticket for her.

73. Upon arriving at the Berlin airport, the others abandoned Hutchison. She saw her friend and fellow actor Johnny Sins, who was also attending the convention. After Hutchison told him about Barcelona, he reassured her that everyone knew her and her reputation and not to worry. They decided to go shopping for the awards ceremony to get her mind off what had happened.

74. When they came back to the hotel later that evening, most of the convention attendees and executives had arrived, and it was clear that false accusations were already spreading about her, only hours after this terrible event.

75. As she walked into the hotel, Hutchison was approached by Defendant Michael Woodside, whom she considered a close friend and second family. Excited to see him, Hutchison hugged him. Woodside asked her where she had been and said the executives were waiting for her. Hutchison asked Woodside if everything was okay, as she was worried something had happened to Zaawaadi.

76. Hutchison then looked up and Adam Diksa, another adult actor with the screen name Keiran Lee, called her up to the second floor of the hotel, where the Aylo executives, Defendants Frank Petosa and Ryan Hogan, were waiting for her.

77. Hutchison, who trusted the executives and always considered them to be her second family, expected them to ask for her account of what had happened in Barcelona. Instead, the executives verbally attacked her with psychologically hurtful and inappropriate things, beginning what would turn into a prolonged smear campaign against her as part of a coverup for Barcelona.

78. Petosa unconscionably centered their false narrative about Hutchison on the 2019 tragic death of Hutchison's teenage daughter, patronizingly telling her "we feel like you haven't properly coped with the death of your daughter."

79. Petosa and Hogan falsely accused her of depression and depression-fueled alcohol and substance abuse, referencing a slight slur in her speech that was caused by a cosmetic procedure to her lips as supposed evidence for insobriety.

80. Further, Petosa and Hogan inappropriately attacked her about other pieces of her personal life, including telling her that the professional skier she was dating is "a piece of shit" and she should leave him.

81. When the executives falsely blamed Hutchison for the lithium poisoning in Barcelona, Hutchison denied it and again suggested that bloodwork analysis should be performed on everyone who was there to find the person who was taking the lithium. They told her that was not necessary, and that she needed to go home to deal with the death of her daughter.

82. Hutchison has performed hundreds of scenes and attended dozens of events and awards ceremonies for Aylo in the four years since her daughter passed away. At no point has anyone expressed concern about how she was "coping." On the contrary, she is often asked how she managed to recover from the tragedy and approach each day with her signature joy, warmth, and love for life.

83. Despite the executives' objections to requesting blood tests to identify who had lithium in their system, Hutchison proactively went to a clinic and tested negative for lithium, which remains in the body for one year after ingestion. She has continued to regularly obtain bloodwork analysis showing no lithium in her system.

84. Despite their ability to access footage from the safety camera which could have shown Liss' lithium pills and how Zaawaadi ended up with lithium in her system, to date the footage has remained suppressed.

85. Hutchison was distraught, having just come off of the trauma of helping save her colleague's life, being physically and sexually assaulted by Danny D., abandoned by

her colleagues, and now verbally attacked and falsely accused by the executives she'd loyally and publicly supported for years– executives who would reprehensibly tarnish the memory of her deceased daughter as part of their attacks.

86. Hutchison couldn't eat and couldn't sleep after the executives attacked her and told her to leave Berlin without any regard for facts and evidence. It was clear that she was going to be the scapegoat for Zaawaadi's potential death from lithium poisoning, even though Danny D's partner Liss was known to be on set with lithium. And it was clear that Aylo would have no hesitation in resorting to appalling behavior like using the death of Hutchison's daughter to spread these lies.

<u>The Aftermath - The Defamation of Hutchison Throughout the Industry</u>

87. After Hutchison left Berlin, the Defendants and others spread falsehoods about Hutchison all over the industry, immediately damaging her reputation and alienating her from her friends and colleagues to protect themselves, Danny D. and his partner Liss. The smear campaign worsened the emotional distress from the events in Barcelona, as did the appalling false accusations by Aylo executives that Hutchison was taking drugs and drinking to cope with the death of her daughter.

88. On October 30, 2023, Hutchison had a meeting with another very well-known adult actress and Brazzers contractor, Angela White. White told Hutchison that she heard from another actor in Berlin who said to White "Spain was a shit show, but thankfully the person responsible is not here," implying that person was Hutchison, as she was the only one from Barcelona no longer in attendance at Berlin.

89. Shortly after, the defamatory rumors began spilling into Hutchison's financial opportunities. An external brand sponsor of Hutchison's told Hutchison that a mutual partner told him to "distance himself from working with Phoenix Marie in the future, as there's something shady going on around her."

90. In January of 2024, Hutchison attended the XBIZ show in Los Angeles, a major industry event important for the actors' brands, both a direct and indirect source of income. Aylo had removed Hutchison from the official Brazzers signing booth. Fortunately, Hutchison was able to rely on her industry relationships to secure an independent space at the event.

91. While at the XBIZ event, Manuel Ferrara, a frequent co-star of Hutchison's and one of the biggest stars in the industry, told Hutchison that he 'heard things were going on" and hoped that she was okay. Another male adult film actor, Ricky Johnson, told her "I just heard from Frank [Petosa]. I know there's some drama around [Barcelona]. I know it wasn't anything good because we all know the rumors going around." Johnson witnessed Hutchison become so upset by the continued character attacks around these traumatic events that she had a breakdown in the middle of the show, cried for over an hour, and couldn't finish her autograph signing. Johnson said that he was happy that he decided not to sell his own business to Aylo, as he didn't want to be associated with the Defendants after this had happened to Hutchison.

92. In another interaction with Ferrara, Ferrara told Hutchison that he wanted to work with her, but implied that his Brazzers contract could be terminated if he filmed content with Hutchison.

93. Not long after, Hutchison began getting blacklisted beyond just the industry. On or about March 1st through 5th, during a trip to Los Angeles, Hutchison contacted more than a dozen makeup artists to schedule hair and makeup ahead of an event. Every single makeup artist refused to work with her, some explicitly stating that they could not risk upsetting Brazzers and losing their contract work with the company as a result of working with her. A local Las Vegas-based makeup artist who regularly works with

Hutchison told Hutchison that another industry makeup artist asked, "do you think she really did it?"

94. On November 28, 2023, in a text conversation with Melissa Hogan, the wife of Aylo executive and Defendant Ryan Hogan, it was clear that Hogan had told his wife about the accusation. She states in the text exchange that she's "so worried" that her husband is "very conflicted"; "It's all very messed up, he's aware and feels so uncomfortable"; "I know that Frank and Ryan are coming from a good place, not a bad one. I know it's hard to realize when there are so many layers to this."; "Ugh I'm sorry ☺ it's all demented."; "He did tell me a break would be good."

95. The stonewalling by Aylo and executives mounted further. Next they went after Hutchison's years of archived material.  The large, high-traffic websites that Aylo controls, like Brazzers and Pornhub, where Hutchison's adult content was accessible, suddenly demoted Hutchison's material.  The algorithmic optimization was now no longer being fed by Aylo, costing Hutchison severe loss of exposure, viewing and financial detriment.

96. In April 2024, Hutchison learned that Aylo had untagged her from all of her Brazzers videos on PornHub, further impacting her algorithmic optimization and making her disappear from search results. This damaged her exposure and potential for earnings.

97. Upon information and belief, Aylo and the powerful players involved in the lithium ordeal and cover-up have intimidated Zaawaadi, who fully recovered after a 5 day medically induced coma, from setting the record straight.

98.  To date Hutchison has lost more than $1,700,000 in revenue since Barcelona because of Defendants' tortious interference with the promotion of her videos and sites.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### AGAINST AYLO

99. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

100.    Aylo and Hutchison entered into a valid and enforceable agreement to perform adult services for money.

101.    Hutchison performed pursuant to the terms of the agreement.

102.    Aylo breached the agreement by improperly terminating Hutchison to cover up what happened with the lithium poisoning on the Barcelona set. Aylo executives were protecting themselves and one of their only large male European producer/directors.

103.    Because of Aylo's breach of the agreement, Hutchison has been damaged in an amount over $5,000,000.00.

104.    It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

### SECOND CAUSE OF ACTION
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### AGAINST AYLO

105.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

106.    A contract existed between Hutchison and Aylo.

107.    Aylo deliberately contravened the intention and spirit of the contract by its actions towards Hutchison as it terminated the relationship based on lies in order to protect its Producer/Director/Male talent Danny D. and his partner.

108.    Aylo's conduct caused damage to Hutchison through this conduct in an amount over $5,000,000.00.

109.     It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

THIRD CAUSE OF ACTION
SEXUAL BATTERY
AGAINST DANNY D.

110.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

111. Danny D. coerced and/or forced Hutchison to have sex with him and two other females after Zaawaadi's poisoning. Hutchison told him she did not want to do the scene, and he forced her to proceed with the scene, against her will.

112. Danny D. wielded his power over the set, a workplace, to make Hutchison engage in a series of sex acts against her will.

113. These nonconsensual sexual acts constitute sexual battery by Danny D. against Hutchison.

114. Hutchison has suffered damages in the amount of over $5,000,000.00 because of the batteries committed against her.

115. It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

FOURTH CAUSE OF ACTION
BATTERY
AGAINST DANNY D.

116. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

117. Danny D. grabbed Hutchison and physically forced her into her room to interrogate her about the lithium.

118. These nonconsensual touchings constitute battery by Danny D. against Hutchison.

119. Hutchison has suffered damages in the amount of over $5,000,000.00 because of the batteries committed against her.

120. It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

## FIFTH CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
## AGAINST ALL DEFENDANTS

121. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

122. Hutchison has contractual relationships with customers and representatives in the adult industry and other endeavors outside of the industry, i.e. conventions, other promotional events, etc.

123. Aylo knew of these relationships as they are ubiquitous throughout the adult entertainment industry.

124. Aylo has actively and intentionally disrupted these relationships and promoted other relationships which benefited Defendants to Hutchison's detriment.

125. Aylo's conduct was not legally justified.

126. As a direct and proximate result of Aylo's interference with Hutchison's contractual relationships, she has been damaged in an amount exceeding $5,000,000.00

127. It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

## SIXTH CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
## AGAINST ALL DEFENDANTS

128. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

129. There were prospective contractual relationships between Hutchison and third-party companies both related and unrelated to the adult industry.

130. The Defendants had knowledge of these prospective relationships.

131. The Defendants intended to harm Hutchison by preventing these relationships.

132. There is no privilege or justification by the Defendants for this activity.

133. Hutchison has suffered actual harm as a result of the Defendants' conduct.

134. It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

<u>SEVENTH CAUSE OF ACTION</u>
<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
<u>AGAINST ALL DEFENDANTS</u>

135. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

136. Defendant Danny D. told Hutchison that they must complete the sex scene minutes after Hutchison performed emergency medical help on Zaawaadi.

137. Hutchison pleaded with Danny D. to continue the scene to another time as she was traumatized by the events of the actress potentially dying.

138. Danny D. forced Hutchison to complete the scene against her will.

139. Danny D. and other defendants covered up the true source of Zaawaadi's lithium overdose by publicly blaming Hutchison for the criminal act of poisoning another person, refusing to conduct even the most cursory investigation into the shoot, and perpetuating the rumor throughout the industry so she was blackballed and outcasted.

140. This was extreme and outrageous conduct by Danny D. with reckless disregard for causing Hutchison emotional distress.

141. This caused Hutchison severe emotional distress in having to complete the scene, and because of this she now has anxiety, panic attacks, sleepless nights, and sexual dysfunction that has severely impacted both her personal and professional life.

142. This emotional distress was caused by the conduct of Danny D and all defendants.

143. Plaintiff has suffered damages in an amount over $5,000,000.00 caused by Danny D's and all defendants' tortious conduct.

144. It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

<u>EIGHTH CAUSE OF ACTION</u>
<u>DEFAMATION</u>
<u>AGAINST ALL DEFENDANTS</u>

145. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

146. Defendants and their representatives and executives have spread lies in the adult community about Hutchison regarding alcohol and drug abuse, the criminal act of poisoning an individual, and her reputation in the business.

147. The statements were published to third persons, and specifically, members of the adult entertainment industry.

148. The statements are false and defamatory and were committed with actual malice.

149. Defendants intentionally published the statements and presented them as fact.

150. Defendants knew the statements published are false, published them with reckless disregard to whether the statements were false or not, and/or negligently made them.

151. The statements constitute the imputation that Hutchison has a lack of fitness for trade, business, or profession.

152. Defendants' malicious and false statements are such that they directly impute to Hutchison's dishonesty, lack of fair dealing, want of fidelity, integrity, and/or business ability, under any reasonable definition, even in general terms and without supporting details.

153. Defendants' malicious and false statements are so likely to cause serious injury to Hutchison's reputation and the business reputations of its officers and pecuniary loss to Hutchison that they are actionable without proof of damages.

154. Hutchison has suffered damages and harms which normally result from such defamation.

155. Defendants are liable for the damages caused by their defamatory statements concerning Hutchison.

156. As a direct and proximate result of Defendants' malicious and false statements, and each of them, Hutchison has suffered actual, consequential, and special damages in excess of five million dollars ($5,000,000.00), the exact amount to be proven at the trial of this matter.

157. As a direct and proximate result of Defendants' defamatory acts, Hutchison has been harmed in amount in excess of five million dollars ($5,000,000.00).

158. As a direct, natural, and foreseeable consequence of Defendants' actions as alleged herein, Hutchison has been required to retain the services of attorneys to prosecute this action, have been damaged thereby, and are entitled to recover reasonable attorney's fees and costs incurred as a result of this action.

159. Furthermore, Defendants are guilty of oppression, fraud, and malice, express or implied; therefore, Plaintiff is entitled to recover damages for the sake of example and

by way of punishing Defendants in an amount in excess of five million dollars ($5,000,000.00), the exact amount to be proven at the trial of this matter.

**NINTH CAUSE OF ACTION**
**CONSPIRACY**
**AGAINST ALL DEFENDANTS**

160. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth fully herein.

161. Defendants, in a combination of two or more persons, conspired to commit unlawful acts against Hutchison.

162. Defendants decided upon an object to be accomplished to harm Hutchison namely Defendants object to be accomplished was to make Hutchison the scapegoat for the bad acts of Danny D.

163. Defendants, in a combination of two or more persons, reached a meeting of the minds as to the object to be accomplished identified above.

164. Defendants committed one or more unlawful, overt acts, including to the detriment and harm of Hutchison.

165. As a direct and proximate result of Defendants' unlawful conspiracy, Hutchison has been harmed in amount in excess of one million dollars ($1,000,000.00).

166. It has been necessary for Hutchison to retain the services of an attorney to prosecute this action and, therefore, Hutchison is entitled to reasonable attorney's fees and costs.

**REQUEST FOR RELIEF**

THEREFORE, Plaintiff Melissa Hutchison aka Phoenix Marie, seeks judgment against Defendants as follows:

    a. For general and special damages of over $30,000,000.00 according to proof;

    b. For punitive damages, respectively, in amounts sufficient to punish Defendants for the tortious conduct in an amount over $50,000,000.00.

c. For an award of pre-judgment interest, as well as reasonable attorneys' fees as both normal and special damages, and other costs; and

d. For such other and further relief that this Court deems just and proper.

Dated this 29th day of April 2024.

KERR SIMPSON ATTORNEYS AT LAW

/s/ Sterling Kerr
P. STERLING KERR, ESQ.
Nevada Bar No. 3978
GEORGE E. ROBINSON, ESQ.
Nevada Bar No. 9667
KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200
Henderson, Nevada 89052
Telephone No. (702) 451-2055
Email: sterling@kerrsimpsonlaw.com
Email: george@kerrsimpsonlaw.com

C.A. GOLDBERG, PLLC
Carrie Goldberg (*pro hac vice* to be filed)
16 Court Street 33rd Fl.
Brooklyn, NY 11241
Telephone No. (646)666-8908
Email: carrie@cagoldberglaw.com

*Attorneys for Plaintiff*