P. STERLING KERR, ESQ.
Nevada Bar No. 3978
GEORGE E. ROBINSON, ESQ.
Nevada Bar No. 9667
KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200
Henderson, Nevada 89052
Telephone No. (702) 451–2055
Email: sterling@kerrsimpsonlaw.com
Email: george@kerrsimpsonlaw.com

CARRIE GOLDBERG, *Pro hac vice* To be filed
C. A. GOLDBERG, PLLC
16 Court Street, 33rd Fl.
Brooklyn, NY 11241
Telephone No. (646) 666-8908
Email: carrie@cagoldberglaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MELISSA HUTCHINSON aka PHOENIX MARIE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ETHICAL CAPITAL PARTNERS LTD., a foreign entity; AYLO PREMIUM LTD., a foreign corporation; DM PRODUCTIONS LTD., a foreign entity; DIGITAL PLAYGROUND, a foreign entity; MIND GEEK USA INCORPORATED, a foreign entity; MG PREMIUM LTD, a foreign entity; DM PRODUCTIONS, a foreign entity; DIGITAL PLAYGROUND, a foreign entity; DANNY MARTIN aka DANNY D, an individual; FRANK PETOSA an individual; RYAN HOGAN, an individual; MICHAEL WOODSIDE, an individual; and DOES 1 through 50.<br><br>Defendants. | Case No.: 2:24-CV-00673-GMN-BNW<br><br><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS FRANK PETOSA, RYAN HOGAN AND MICHAEL WOODSIDE'S MOTION TO DISMISS** |

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

COMES NOW Plaintiff, MELISSA HUTCHINISON, by and through their attorneys GEORGE E. ROBINSON, ESQ. of KERR SIMPSON ATTORNEYS AT LAW, and hereby oppose Defendants Frank Petosa, Ryan Hogan, and Michael Woodside's (hereinafter "Defendants") Motion to Dismiss.

This Opposition is made and based upon all the papers and pleadings on file herein, the Points and Authorities attached hereto, and such oral argument as may be adduced at a hearing of this matter.

DATED this 13th day of August, 2024.

KERR SIMPSON ATTORNEYS AT LAW

/s/ George E. Robinson, Esq
P. STERLING KERR, ESQ.
Nevada Bar No. 003978
GEORGE E. ROBINSON, ESQ.
Nevada Bar No. 9667
KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200
Henderson, Nevada 89052
Telephone No. (702) 451–2055
Email: sterling@kerrsimpsonlaw.com
Email: george@kerrsimpsonlaw.com
*Attorneys for Plaintiff*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

The Court should deny Defendants Motion to Dismiss as their contacts with Nevada are sufficient for the Court to exercise specific personal jurisdiction over them. Defendants were part of a plan to save themselves and their companies from liability when a life-threatening, coma-inducing medical emergency with another adult actress transpired on-set, Plaintiff Melissa Hutchison, was the only one who responded to the poor, young actress dying on the couch.

After the distressing emergency, producers violated industry-wide standard of care by forcing Plaintiff to continue filming an orgy scene and never conducting a proper investigation into the crisis. Worried that he or his girlfriend could be blamed for causing the medical emergency, the director (and lead actor) of the shoot unfurled an elaborate plan for Hutchison to take the fall, claiming falsely that Hutchison had provided lithium to the actor who became violently ill. As a result of Defendants' scorched earth campaign to destroy her hard-earned career – resulting in her being blackballed within the industry and the algorithmic suppression of her archives of online content, Plaintiff has suffered severe and pervasive reputational, emotional, and financial harm.

In their Motion, Defendants attempt to link this case to the *Walden* case which is not an apt comparison. *Walden v. Fiore*, 571 U.S. 277 (2014). In this case, unlike Walden, the parties have known each other for years, and the Plaintiff believes they are "like family." They all knew that Plaintiff lives in Las Vegas and does work in Las Vegas. The Defendants availed themselves of the State of Nevada quite frequently. Ryan Hogan and Frank Petosa would come to Las Vegas working for Brazzers for one week every three to four months for "protocols." During these visits, they would meet with the three directors that were based in Las Vegas and the adult actors to make sure everyone was being treated fairly and the rules were being followed. Every time Hogan and Petosa came to Las Vegas, aside from seeing them for work issues, Plaintiff and Defendants would all go to dinner and visit together. Michael Woodside was a "digital tech guy" who would come to Las Vegas for live stream pornography shows for Brazzers starting in 2012 through 2015. He came to AVN every year in Las Vegas except when COVID shots were required for travel. Brazzers also held a party each year in Las Vegas, and it was attended by Woodside, Petosa, and Hogan. In the *Walden* case, the Defendant was a police officer and

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

complete stranger to Plaintiff.  The Defendants have consented to a possible lawsuit related to their former friend and coworker in the state of Nevada through this conduct.

Therefore, Defendants' contacts with Nevada are sufficient for the Court to exercise specific personal jurisdiction. Defendants have purposefully directed their conduct towards, and purposefully availed himself of the privileges and benefits of Nevada as they have traveled to Nevada many times, namely to attend the largest adult tradeshow in the world, and other industry related trips.  In the alternative, Plaintiff requests the Court grant her leave to conduct jurisdictional discovery and/or to amend their First Amended Complaint.

## II. STATEMENT OF FACTS

### a. Factual Background[1]

Plaintiff Melissa Hutchison has been an adult performer for about 18 years under the screen name of Phoenix Marie. Hutchison entered into numerous written agreements to work with the Defendant companies, subsidiaries, and predecessors to perform in adult films and attend adult-themed events and expositions.  Hutchison has been one of the most prolific and popular stars in the industry, the only adult actor in every single industry hall of fame, and believed to be the highest continually paid star. Her performances have made the Defendant companies in excess of tens of millions of dollars.  In early October of 2023, Aylo executives met with Hutchison in Montreal to discuss the plans they'd mapped out for her for 2024, including but not limited to 12 months of video shoots, events, and awards, as well as using her as a cover model for the Brazzers 20th anniversary marketing materials and events. They also told her she would be receiving a Brand Ambassador award at the 2024 AVN Awards. It was clearly indicated that Aylo planned both to fulfill her current contract and renew for an additional year.

---

[1] *See* ECF No. 9 at p. 6-18, Facts from First Amended Complaint.

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

In October of 2023, following the planning meeting in Montreal, Hutchison traveled to Barcelona to shoot scenes for Danny D. and Digital Playground to perform with Danny D., Cherie DeVille and others. The main actors were staying in the same residence along with some of the other staff needed for the shoot.  In addition to his role as an actor, Danny D. was also the director and producer of the shoot, responsible both for ensuring the safety of everyone on set and ensuring compliance with the rules and regulations set by Aylo for protocol on set. Danny D. was at the Barcelona shoot with his partner, Liss, who was also the makeup artist, the production manager, and the talent assistant (a role that includes advocating for and protecting the actors, particularly if they're uncomfortable with a request from the director).  During downtime at the residence, Liss confided to Hutchison that she was dealing with depression tied to her relationship with Danny D., including his sexual intercourse with numerous other partners, both as an adult actor and casually, with no formal commitment to her.  Liss made known to Hutchison that she had lithium on set that she claimed she had purchased and was taking to self-medicate for her depression related to Danny D. Liss implied she was not prescribed the medication by a doctor or other medical professional.

One of the other actors staying in the residence was a young female with the screen name Zaawaadi.  During this shoot, Zaawaadi was slated to to perform her first anal sex scene and informed Hutchison prior to the scene that she had ingested 3 pills of the anti-diarrheal drug Imodium to avoid passing stool during the scene.  She told Zaawaadi prior to her anal scene that Imodium could be harmful, and that taking three, which is higher than the recommended dose, could cause dehydration and other complications, especially when combined with drinking alcohol, which Zaawaadi and several of the other actors had done the night before. Hutchison offered Zaawaadi 2 natural probiotic pills and 2 homeopathic laxative pills called Senokot to help counter the ingestion of the 3 Imodium pills and restore gut health.  Hutchison told

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

Zaawaadi that these over-the-counter supplements might prevent issues associated with anal sex like tearing, yeast infections, and bowel obstructions if taken after the scene.

On the final day of shooting, Hutchison was performing in an orgy scene by the pool with Danny D. and the remaining female actresses, not including Zaawaadi. In the middle of the scene, Liss came out of the house screaming "Emergency, Emergency! She can't breathe." Hutchison, with her medical background and E.M.T. training, immediately left the scene mid-shoot and ran into the house. Zaawaadi was in the house lying on the couch, fully clothed having a medical emergency. She was shaking violently and uncontrollably and screaming that she couldn't breathe. Hutchison cared for Zaawaadi with her sister remaining on the phone for more than an hour. Nobody else on the set took any action to help, seemingly concerned about the optics. Danny D., who was directly in charge of the set, refused to call for the ambulance and directed the others not to call for one. Only when it became clear Zawaadi's medical emergency was life-threatening did he finally relent and permit an ambulance to be called. After this traumatic medical emergency, as paramedics were carrying her out of the house, Zaawaadi verbally requested Hutchison to travel with her in the ambulance. Danny D. forcibly grabbed Hutchison and forbade her from leaving the set, demanding that she finish the scene immediately because he was worried that he would lose daylight for shooting.

Hutchison was extremely upset and in shock, worried about whether Zaawaadi would survive. She pleaded with Danny D. to shoot the scene at another time. She made it unquestionably clear both to Danny D. and his partner Liss, the talent assistant tasked with protecting performers from shooting scenes against their wills, that she did not want to continue. Danny D. coerced Hutchison into completing the scene against her will, in clear contradiction of Aylo policies, including the mandatory Aylo Pre Shoot Discussion and Boundaries Checklist, which everybody had signed. After the traumatic experience of shooting the scene, a scene that

involved Danny D. degrading and humiliating her, Hutchison remained very distraught at how the situation with Zaawaadi had been managed and how she was forced by Danny D. to have sex despite repeatedly saying no.

Hutchison also was deeply concerned about Zaawaadi's well-being but when she said she wanted to go to the hospital to check on Zaawaadi, Danny D. told her that she could not go. Hutchison had no means of independent transportation or information about which hospital Zaawaadi had been taken to and was unable to go around Danny D. Hutchison immediately retired to her room for the rest of the evening. Early the next morning, Danny D. claimed that the police had come to the home late at night and forced him to go to the hospital. Hutchison, who was unable to sleep given the trauma of the afternoon, and whose room was right by the front door, had not seen or heard any indication of guests, including police. That next day after the purported visit by law enforcement, Danny D. suddenly was fixated on the optics of "the story." By this point, Danny D. was openly hostile toward Hutchison. At one point that morning Danny D. again forcefully grabbed Hutchison and pulled her into her room, this time throwing her onto the floor and saying "we need to get our story straight." He admitted that, although nearly 24 hours after the incident, he had still not reported Zaawaadi's hospitalization and his assault of Hutchison to the corporate office. Danny D. demanded that Hutchison show him the pills she gave Zaawaadi, taking pictures of the homeopathic probiotics and laxatives, as well as their bottles. He then told Hutchison that Zaawaadi had "gone mad," overdosed on lithium and was in a medically-induced coma, and shared a video of Zaawaadi thrashing around and convulsing on the hospital bed. Danny then asked her if there were any other medications she was taking and demanded to see them. Hutchison told Danny D. she was not taking lithium and didn't have lithium, showing him all of her medications to confirm. She then turned to Liss, who had followed them into the room, and said, "You're taking lithium, did Zaawaadi take yours?"

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

Liss denied that she was taking lithium, despite having just confided it to Hutchison when they arrived on set and having her pills out on the counter in the common area of the house.

Despite not finding any lithium in Hutchison's possession and being informed that his partner Liss had lithium in the house, Danny D. knowingly began to advance a false narrative that Hutchsion had poisoned and almost killed Zaawaadi, making her a scapegoat when in fact she had saved Zaawaadi's life, even as he refused to call for an ambulance. With Zaawaadi in a critical medical state, Danny D. was protecting his partner Liss from a potential investigation into Zaawaadi's death by lithium poisoning and shifting the focus away from his repeated mismanagement of the shoot and the medical crisis the previous day. Furthermore, Danny D. knew that Hutchison had been through a horrible event a few years earlier when her 18-year-old daughter died of cancer. Danny D. could tell everyone that it must have been Hutchison who had the lithium because of depression caused by the death of her daughter.  Ironically, Hutchison had helped Danny D. treat his own depression and suicidal ideations, which he has talked about publicly.

The next day, despite Zaawaadi still in the hospital in a coma, everyone at the Barcelona shoot was required to fly to Berlin to attend an adult convention where many performers and executives would be present. As she walked into the hotel, Hutchison was approached by Defendant Michael Woodside, whom she considered a close friend and second family. Excited to see him, Hutchison hugged him. Woodside asked her where she had been and said the executives were waiting for her. Hutchison asked Woodside if everything was okay, as she was worried something had happened to Zaawaadi.

Hutchison then looked up and Adam Diksa, another adult actor with the screen name Keiran Lee, called her up to the second floor of the hotel, where the Aylo executives, Defendants Frank Petosa and Ryan Hogan, were waiting for her. Hutchison, who trusted the executives and

always considered them to be her second family, expected them to ask for her account of what had happened in Barcelona. Instead, the executives verbally attacked her with psychologically hurtful and inappropriate things, beginning what would turn into a prolonged smear campaign against her as part of a coverup for Barcelona.  Petosa unconscionably centered their false narrative about Hutchison on the 2019 tragic death of Hutchison's teenage daughter, patronizingly telling her "we feel like you haven't properly coped with the death of your daughter." Petosa and Hogan falsely accused her of depression and depression-fueled alcohol and substance abuse, referencing a slight slur in her speech that was caused by a cosmetic procedure to her lips as supposed evidence for insobriety.  Further, Petosa and Hogan inappropriately attacked her about other pieces of her personal life, including telling her that the professional skier she was dating is "a piece of shit" and she should leave him.  When the executives falsely blamed Hutchison for the lithium poisoning in Barcelona, Hutchison denied it and again suggested that bloodwork analysis should be performed on everyone who was there to find the person who was taking the lithium. They told her that was not necessary, and that she needed to go home to deal with the death of her daughter. Hutchison has performed hundreds of scenes and attended dozens of events and awards ceremonies for Aylo in the four years since her daughter passed away.

Hutchison was distraught, having just come off of the trauma of helping save her colleague's life, being physically and sexually assaulted by Danny D., abandoned by her colleagues, and now verbally attacked and falsely accused by the executives she'd loyally and publicly supported for years– executives who would reprehensibly tarnish the memory of her deceased daughter as part of their attacks.  Hutchison couldn't eat and couldn't sleep after the executives attacked her and told her to leave Berlin without any regard for facts and evidence. It was clear that she was going to be the scapegoat for Zaawaadi's potential death from lithium

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

poisoning, even though Danny D's partner Liss was known to be on set with lithium. And it was clear that Aylo would have no hesitation in resorting to appalling behavior like using the death of Hutchison's daughter to spread these lies.

After Hutchison left Berlin, the Defendants and others spread falsehoods about Hutchison all over the industry, immediately damaging her reputation and alienating her from her friends and colleagues to protect themselves, Danny D. and his partner Liss. The smear campaign worsened the emotional distress from the events in Barcelona, as did the appalling false accusations by Aylo executives that Hutchison was taking drugs and drinking to cope with the death of her daughter.

On October 30, 2023, Hutchison had a meeting with another very well-known adult actress and Brazzers contractor, Angela White. White told Hutchison that she heard from another actor in Berlin who said to White "Spain was a shit show, but thankfully the person responsible is not here," implying that person was Hutchison, as she was the only one from Barcelona no longer in attendance at Berlin.  Shortly after, the defamatory rumors began spilling into Hutchison's financial opportunities. An external brand sponsor of Hutchison's told Hutchison that a mutual partner told him to "distance himself from working with Phoenix Marie in the future, as there's something shady going on around her."  In January of 2024, Hutchison attended the XBIZ show in Los Angeles, a major industry event important for the actors' brands, both a direct and indirect source of income. Aylo had removed Hutchison from the official Brazzers signing booth. Fortunately, Hutchison was able to rely on her industry relationships to secure an independent space at the event.  While at the XBIZ event, Manuel Ferrara, a frequent co-star of Hutchison's and one of the biggest stars in the industry, told Hutchison that he 'heard things were going on" and hoped that she was okay. Another male adult film actor, Ricky Johnson, told her "I just heard from Frank [Petosa]. I know there's some drama around [Barcelona].  I know it

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

wasn't anything good because we all know the rumors going around." Johnson witnessed Hutchison become so upset by the continued character attacks around these traumatic events that she had a breakdown in the middle of the show, cried for over an hour, and couldn't finish her autograph signing. Johnson said that he was happy that he decided not to sell his own business to Aylo, as he didn't want to be associated with the Defendants after this had happened to Hutchison.

In another interaction with Ferrara, Ferrara told Hutchison that he wanted to work with her, but implied that his Brazzers contract could be terminated if he filmed content with Hutchison.  Not long after, Hutchison began getting blacklisted beyond just the industry.  On or about March 1st through 5th, during a trip to Los Angeles, Hutchison contacted more than a dozen makeup artists to schedule hair and makeup ahead of an event. Every single makeup artist refused to work with her, some explicitly stating that they could not risk upsetting Brazzers and losing their contract work with the company as a result of working with her. A local Las Vegas-based makeup artist who regularly works with Hutchison told Hutchison that another industry makeup artist asked, "do you think she really did it?"

On November 28, 2023, in a text conversation with Melissa Hogan, the wife of Aylo executive and Defendant Ryan Hogan, it was clear that Hogan had told his wife about the accusation. She states in the text exchange that she's "so worried" that her husband is "very conflicted"; "It's all very messed up, he's aware and feels so uncomfortable"; "I know that Frank and Ryan are coming from a good place, not a bad one. I know it's hard to realize when there are so many layers to this."; "Ugh I'm sorry ☹ it's all demented."; "He did tell me a break would be good."

The stonewalling by Aylo and executives mounted further. Next they went after Hutchison's years of archived material.  The large, high-traffic websites that Aylo controls, like

Brazzers and Pornhub, where Hutchison's adult content was accessible, suddenly demoted Hutchison's material.  The algorithmic optimization was now no longer being fed by Aylo, costing Hutchison severe loss of exposure, viewing and financial detriment.

### b.  Jurisdictional Facts

Jurisdiction is proper as the parties conduct business in and have sufficient contacts with the State of Nevada as the corporate Defendants sell millions of dollars' worth of pornographic materials in the State of Nevada and attend and promote large conventions in the State of Nevada.  In his sworn statement, Frank Petosa states the "since 2019, I have visited Nevada … two or three times to attend the annual AVN Adult Entertainment Expo." *See* ECF 13-1, Petosa Statement.  Ryan Hogan states that "since 2019, I have visited Nevada …a handful of times each year for personal and/or business reasons." *See* ECF 13-2, Hogan Statement.  Michael Woodside states "since 2019, I have visited Nevada … three times to attend the annual AVN Adult Entertainment Expo." *See* ECF 13-3, Woodside Statement.

The Defendants are being coy and did not disclose all of their contacts with Las Vegas in their sworn statements attached to the Motion to Dismiss.  The truth of the matter is that the Defendants have availed themselves of the State of Nevada frequently.  Ryan Hogan and Frank Petosa would come to Las Vegas working for Brazzers for one week every three to four months for "protocols." *See* Exhibit 1, Declaration of Melissa Hutchinson.  During these visits, they would meet with the three directors that were based in Las Vegas and the adult actors to make sure everyone was being treated fairly and the rules were being followed.  Id.  Every time Hogan and Petosa came to Las Vegas, aside from seeing them for work issues, Plaintiff and Defendants would all go to dinner and visit together.  *Id.*  Michael Woodside was a "digital tech guy" who would come to Las Vegas for live stream pornography shows for Brazzers starting in 2012 through 2015.  *Id.*  He came to AVN every year in Las Vegas except when COVID shots were

required for travel. *Id*. Brazzers also held a party each year in Las Vegas, and it was attended by Woodside, Petosa, and Hogan. *Id*.

### III. LEGAL STANDARD

#### A.  LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) permits a defendant, by way of motion, to assert the defense that a court lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). Once a defendant raises personal jurisdiction as a defense, the burden then falls on the plaintiff to prove sufficient facts to establish that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). A plaintiff may carry this burden by presenting sufficient evidence to establish that: 1) personal jurisdiction is proper under the laws of the state where it is asserted; and 2) the exercise of jurisdiction does not violate the defendant's right to due process secured by the United States Constitution. *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995); *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404-05 (9th Cir. 1994). To overcome a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make "a *prima facie* showing of jurisdictional facts." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006) (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001)). Furthermore, when analyzing such a motion to dismiss, "the court resolves all disputed facts in favor of the plaintiff." *Id*.

When no federal statute applies to the determination of personal jurisdiction, the law of the state in which the district court sits applies. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Because Nevada's long-arm statute reaches the outer limits of federal constitutional due process, courts in Nevada need only assess constitutional principles of due process when determining personal jurisdiction. *See* Nev. Rev. Stat. § 14.065; *Galatz v. Eighth Judicial Dist. Court*, 683 P.2d 26, 28 (Nev. 1984).

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

Due process requires that a non-resident defendant have minimum contacts with the forum such that the "maintenance of the suit will not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts can give rise to either general or specific jurisdiction. *LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000). General jurisdiction exists where a defendant maintains "continuous and systematic" ties with the forum state, even if those ties are unrelated to the cause of action. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)). Specific jurisdiction exists where claims "arise out of" or "relate to" the contacts with the forum, even if those contacts are "isolated or sporadic." *Id.*

To establish specific jurisdiction, three requirements must be satisfied. First, the defendant must either purposefully direct his activities toward the forum or purposefully avail[] himself of the privileges of conducting activities in the forum. Second, 'the claim must be one which arises out of or relates to the defendant's forum related activities.' And third, 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'" Regarding the first prong, the court employs the "purposeful direction test derived from Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)" when "a cause of action . . . sounds in tort[.]" *Ratha*, 35 F.4th at 1171.

Under such test, a plaintiff will have met the first prong of specific jurisdiction only if he can establish that the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." Id. at 1171-72. If, on the other hand, the cause of action sounds in contract, then the court employs the purposeful availment analysis under the first prong for specific jurisdiction. *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021). In determining purposeful

availment, the court must look at "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . ." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).

### B.  FAILURE TO STATE A CLAIM PURSUANT TO FRCP 12(b)(6)

The Plaintiff does not have to prove the entirety of its case in the Complaint as the Defendants would like the Court to believe. "Our system of notice pleading "do[es] not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Instead, "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Yamaguchi v. U.S. Air Force*, 109 F.3d 1475, 1481 (9th Cir. 1997).  The Complaint for the torts alleged against the Defendants clearly does this.

One of the seminal cases on point, *Twomby*, states "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F. 3d 247, 251 (CA7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U. S. 265, 286 (1986)." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid., a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the … claim is and the grounds upon which it rests," *Conley v.*

1   *Gibson*, 355 U. S. 41, 47 (1957). *See also Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-

2   65 (2007).

3   **IV.LEGAL ARGUMENT**

4

5       **A. THE COURT SHOULD DENY THE MOTION TO DISMISS BASED ON LACK OF PERSONAL JURISDICTION**

6       **a. The Court Should Exercise Specific Jurisdiction Over Defendants Because Defendants have Sufficient Minimum Contacts with Nevada.**

7

8       The Court should deny Defendants' Motion to Dismiss as Defendants have sufficient

9   contacts with Nevada for the Court to exercise specific personal jurisdiction over them. Specific

10  personal jurisdiction refers to "jurisdiction based on the relationship between the defendant's

11  forum contacts and the plaintiff's claims." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007).

12  Personal jurisdiction must arise out of "contacts that the defendant *himself* creates with the forum

13  State." *Waldon v. Fiore*, 571 U.S. 277, 284 (2014) (internal quotations omitted). Further,

14  personal jurisdiction cannot be established from the conduct of a plaintiff or third parties within

15  the forum. *Id.* In other words, "the plaintiff cannot be the only link between the defendant and

16  the forum." *Id.* at 285.

17

18      Courts utilize a three-prong test to analyze whether the assertion of specific personal

19  jurisdiction in a given forum is proper:

20          (1) The non-resident defendant must [a] purposefully direct his activities or
            consummate some transaction with the forum or resident thereof; or [b]

21              perform some act by which he purposefully avails himself of the
            privilege of conducting activities in the forum, thereby invoking the

22              benefits and protection of its laws;

23          (2) the claim must be one which arises out of or relates to the defendant's
            forum related activities; and

24          (3) the exercise of jurisdiction must comport with fair play and substantial
            justice, i.e. it must be reasonable.

25

26      *Schwarzenneger*, 374 F.3d 797 at 802.

27

28

The plaintiff bears the burden of satisfying the first two prongs of the test. *Id.* If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.* citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In a securities case, the first prong of the specific jurisdiction analysis may be established either by purposeful direction or purposeful availment. *See, e.g.*, *SEC v. Jammin' Java Corp.*, No. 2:15-cv-08921-SVW-MRW, 2016 U.S. Dist. LEXIS 184773, at *23 (C.D. Cal. July 18, 2016). The brief will address each of the three prongs in turn.

### i. Defendants Purposefully Directed their actions towards Nevada and purposefully availed themselves of the privileges and benefits of Nevada's laws.

In their conduct, Defendants purposefully directed his conduct towards Nevada and purposefully availed themselves of the privileges, benefits, and protections of Nevada's laws. A showing that a defendant purposefully availed themselves of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum. *Schwarzenegger*, 374 F.3d 797 at 802 (citing *Hanson v. Denckla*, 357 U.S. 234, 253 (1958)). A showing that a defendant purposefully directed his conduct toward a forum state usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere. *Id.* at 803.

Here, Defendants have purposefully directed their conduct towards Nevada. The First Amended Complaint states that "Jurisdiction is proper as the parties conduct business in and have sufficient contacts with the State of Nevada as they sell millions of dollars' worth of pornographic materials in the State of Nevada and attend and promote large conventions in the State of Nevada." *See* ECF 9 at p. 6.  This is not the full extent of these Defendants' contacts with the state. The Defendants have availed themselves of the State of Nevada frequently.  Ryan

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

Hogan and Frank Petosa would come to Las Vegas working for Brazzers for one week every three to four months for "protocols." *See* Exhibit 1, Declaration of Melissa Hutchinson. During these visits, they would meet with the three directors that were based in Las Vegas and the adult actors to make sure everyone was being treated fairly and the rules were being followed. *Id*. Every time Hogan and Petosa came to Las Vegas, aside from seeing them for work issues, Plaintiff and Defendants would all go to dinner and visit together. *Id*. Michael Woodside was a "digital tech guy" who would come to Las Vegas for live stream pornography shows for Brazzers starting in 2012 through 2015. *Id*. He came to AVN every year in Las Vegas except when COVID shots were required for travel. *Id*. Brazzers also held a party each year in Las Vegas, and it was attended by Woodside, Petosa, and Hogan. *Id*. Therefore, Defendants both purposefully directed their activities at Nevada and also purposefully availed themselves of the privileges, benefits, and protections of Nevada's laws.

### ii. Plaintiff's Claims Arise Out of Defendants and the Other Defendants' Forum Related Activities.

The Court should deny Defendants' Motion because Plaintiff's claims arise out of the Defendants' activities related to the State of Nevada. The Second prong of the specific jurisdiction test is that the contacts constituting purposeful availment must be the ones that give rise to the current suit. *See Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000). In the Ninth Circuit, the requirement is measure in terms of "but for" causation. *Id.*, *see also Ziegler v. Indian River County*, 64 F.3d 470, 474 (9th Cir. 1995).

Here, Plaintiff's claims arise out of Defendants' Nevada directed activities. As stated above, the activity in the State of Nevada is related to these claims regarding the adult industry. Ryan Hogan and Frank Petosa are industry executives who would come to Las Vegas working for Brazzers for "protocols." *See* Exhibit 1. They met with directors of adult films and the adult actors to make sure everyone was being treated fairly and the rules were being followed. *Id*.

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

Had these protocols been followed in Plaintiff's circumstance, maybe she wouldn't have been damaged the way she has.   Every time Hogan and Petosa came to Las Vegas, aside from seeing them for work issues, Plaintiff and Defendants would all go to dinner and visit together. *Id*.  The other Defendant, Michael Woodside was a "digital tech guy" who would come to Las Vegas for live stream pornography shows for Brazzers starting in 2012 through 2015. *Id*.  He came to AVN every year in Las Vegas except when COVID shots were required for travel. *Id*.  Brazzers also held a party each year in Las Vegas, and it was attended by Woodside, Petosa, and Hogan. *Id*. Clearly, in committing the tortious activity at a known resident of the State of Nevada they have fulfilled this requirement of personal jurisdiction.  But for Defendants' Nevada directed conduct against Plaintiff, Plaintiff would not have suffered the damages alleged. Therefore, Plaintiff's claims against Defendants arise out of Defendants' duplicitous conduct directed towards Nevada.

### iii.   Exercising Jurisdiction Over Defendants Comports with Fair Play and Substantial Justice.

The Court should deny Defendants' Motion and exercise jurisdiction because the exercise of jurisdiction is reasonable. Given that Plaintiff haS satisfied the first two prongs of the personal jurisdiction test, the burden now shifts to Defendants to show that exercising jurisdiction would be unreasonable. *Schwarzenegger*, 374 F.3d 797 at 802. In determining whether the exercise of jurisdiction comports with fair play and substantial justice, the Ninth Circuit evaluates seven factors: 1) the extent of the defendant's purposeful injection in the forum state's affairs; 2) the burden on the defendant of defending in the forum; 3) the extent of conflict with the sovereignty of the defendant's state; 4) the forum state's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the controversy; 6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum. *Dole Food Co., Inc., v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002).

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

Here, the exercise of jurisdiction over Defendants comports with fair play and substantial justice.  As stated above, the Defendants' purposeful injection into Nevada's affairs is extensive.  Plaintiff is one of the biggest stars in the industry and has made the Defendant companies millions of dollars in revenue.  *See* ECF No. 9 at p. 7.  The parties have known each other for years, and the Plaintiff believes they are "like family." *Id*. at p. 14. As stated above, Hogan and Petosa came to Las Vegas once every 3 or 4 months a year for one week at a time to discuss business with producers and actors in the adult industry.  *See* Exhibit 1.  Because of this family-type relationship, they all know that Plaintiff lives in Las Vegas and does work in Las Vegas.  Defendants have all traveled multiple times to Las Vegas for the industry tradeshows, meetings and parties that are clearly related to the subject matter of this lawsuit and these claims.

Defendants' burden of defending the instant lawsuit is relatively low.  Las Vegas is a hub for the entire adult industry that all of the Defendants are involved in.  The Defendants in this case are located all over the world, and Las Vegas is a place that all of them meet at least once per year.  Some of the other locations of the Defendants are Cyprus, the United Kingdom and the British Virgin Islands.  These Defendants are located in Canada and California of which Las Vegas is probably the least burdensome.

The extent of conflict with the sovereignty of the defendant's state is extremely minimal.  The victim of Defendants' duplicitous conduct in the instant case is a Nevada resident. Nevada has a substantial interest in seeing justice carried out. Nevada public policy strongly supports seeing perpetrators of tortious activity against its citizens be brought to justice and make the victims whole.

Nevada federal court is the most efficient forum to seek judicial resolution of the controversy and provides the most convenient and effective relief to Plaintiffs. Defendants are citizens of Canada and California.  Rather than have the matter heard in another sovereign court,

the matter is brought in the U.S. District Court, District of Nevada which is an impartial forum. Nevada provides the most convenient forum to adjudicate the matter. Plaintiff, the victim of Defendants, should not be forced to litigate the matter in a distant jurisdiction such as Canada or California or Cyprus or the United Kingdom or the British Virgin Islands. The harm that Plaintiff felt was felt in Nevada.

California may be an alternative forum to Nevada, but these fora are close in proximity, and Nevada has a much more compelling interest in providing a forum whereby Plaintiff can pursue justice for the damages inflicted upon them by Defendants. Furthermore, the damage was felt in Nevada. Therefore, the factors analyzed in this section speak strongly in favor of the Court exercising jurisdiction over Defendants.

### b. Alternatively, Plaintiffs' Request Leave of the Court to Conduct Jurisdictional Discovery to Ascertain the Extent of Defendants' Nevada Contacts and/or Grant Leave to Amend.

Plaintiffs have properly demonstrated to this Court that Defendants' contacts with the State of Nevada are such that the Court may exercise both general and specific personal jurisdiction over him. However, in the alternative, Plaintiffs request that the Court grant Plaintiff leave to conduct jurisdictional discovery to ascertain the full extent of Defendants' Nevada Contacts or grant Plaintiff leave to amend. Regarding requests for jurisdictional discovery, the Ninth Circuit has articulated discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary. *Boschetto v. Hansin*, 539 F.3d 1011, 1020 (9th Cir. 2008). It is only appropriate to deny jurisdictional discovery when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction. *Am. W. Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989). Regarding leave to amend, FRCP 15(a) directs that leave shall be freely given to amend a pleading when justice so requires. If the court grants a

Rule 12(b)(6) motion to dismiss, it should grant leave to amend unless the deficiencies cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Under Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and absent "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments . . . undue prejudice to the opposing party . . . futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The court should grant leave to amend "even if no request to amend the pleading was made." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks omitted).  *Duenas v. Wal-Mart Stores E., LP*, 2:21-CV-1547 JCM (DJA), 4 (D. Nev. Sep. 30, 2022)

Here, Plaintiff became associated with a portion of Defendants' Nevada contacts in the preparation of the First Amended Complaint. It is possible that Defendants have more contacts with Nevada that Plaintiff is unaware of. In order to obtain a more satisfactory showing of facts that form the basis of jurisdiction in Nevada, Plaintiff requires jurisdictional discovery. Furthermore, insomuch that this Court finds the cause of action in Plaintiff's First Amended Complaint to be improperly pled, Plaintiff requests leave of this Court to amend the First Amended Complaint accordingly.

**B. THE COURT SHOULD DENY THE MOTION TO DISMISS AS THE PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS ARE SUFFICIENTLY STATED PURSUANT TO FRCP 8, OR IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED**

a.   <u>The Defamation Claims are proper and should not be dismissed</u>

The slanderous claims spread by the Defendants are properly pled, so the Defendants can understand the wrongs alleged by the Plaintiff.  The Complaint makes it clear that the Defendants spread horrible falsehoods about the Plaintiff, namely that she was responsible for the poisoning of a young actress who was on her death bed in a foreign hospital, and that the whole situation had occurred because she hadn't gotten over the loss of her teenage daughter to

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

cancer.  These falsehoods were spread throughout the industry as detailed in the Complaint.

"Under Nevada common law, defamation requires '(1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.' *Pope v. Motel 6,* 121 Nev. 307, 114 P.3d 277, 282 (2005)." *Tsao v. Desert Palace, Inc.*, 698 F. 3d 1128 - Court of Appeals, 9th Circuit 2012.  "if the defamatory communication imputes a "person's lack of fitness for trade, business, or profession," or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed." *K-Mart Corporation v. Washington*, 866 P.2d 274, 282 (Nev. 1993).

Here, Plaintiff has properly pled all of the elements to a claim of Defamation Per Se for the Defendants to have notice and understand the allegation. In their Motion to Dismiss, the Defendants state, "Plaintiff does not identify when and to whom the statements were made, and therefore does not sufficiently plead the claim of defamation."  *See* ECF No. 13 at p. 19.  The false statements made by the Defendants are explained in paragraphs 77-81 of the Complaint. *See* ECF No. 9 at p. 14-15.  The blaming of Hutchinson for the lithium poisoning of the actress (and potentially a murder); the accusations that she was a drunk and drug addict; and the accusation that she hadn't properly dealt with the death of her daughter.  *Id.*  The next 3 pages of the Complaint state who the defamatory statements were made to and when they were made, including Plaintiff's co-stars and peers, the other Defendants and persons in the meeting in Germany, mutual partners, hair and makeup artists, Ryan Hogan's spouse, and other adult industry professionals.  *Id.* at p. 16-18, paragraphs 88-94.  The Defendants were at fault as they easily could have done bloodwork (*Id.* at p. 15, paragraph 81) or reviewed the footage from the safety camera.  *Id.* at p. 15 at paragraph 84.  In this situation, the claim is defamation per se as the statements alleged go to her business and also the false allegations are criminal acts, so

KERR SIMPSON ATTORNEYS AT LAW

2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052

Telephone (702) 451-2055 Facsimile (702) 451-2077

damages are presumed.

b. <u>The Claim of Intentional Infliction of Emotional Distress is Properly Pled and Should Not be Dismissed</u>

As stated in the Complaint, because of the tortious conduct in intentionally inflicting emotional distress on the Plaintiff through their horrific conduct towards her, she has suffered extreme emotional distress. This is not only through the conduct of the director in forcing her to have sex, but through the conduct of these Defendants stating that she was responsible for the poisoning of a young actress who was on her death bed in a foreign hospital, and that the whole situation had occurred because she hadn't gotten over the loss of her teenage daughter to cancer, and telling everyone they could about it leading to her financial ruin.

The elements of an intentional infliction of emotional distress ("IIED") claim are: (1) extreme and outrageous conduct with either the intention of, or disregard for, causing emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) actual or proximate causation. *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 92 (1981). The *Beckwith* case gives a factual scenario for IIED that the Nevada Supreme Court upheld. *Dillard Dept. Stores, Inc. v. Beckwith*, 989 P. 2d 882 - Nev: Supreme Court 1999. In that case, Dillard's Department Store did not offer a longtime employee her previous position as an area sales manager when she returned to work after she injured herself by straining her back. She had her salary reduced, and other employees openly speculated as to the reason for Beckwith's demotion, and her complaints to management that her job situation was having an adverse effect on her health were ignored. *Id*. at p. 884. This was IIED, and she was awarded $200,000.00 in damages. Restatement (Second) of Torts § 46 comment k states that bodily harm is not necessary. "In such cases the courts may perhaps tend to look for more in the way of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has been severe emotional distress, bodily harm is not required." The facts as stated of Defendants stating that

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077

she was responsible for the poisoning of a young actress who was on her death bed in a foreign hospital, and that the whole situation had occurred because she hadn't gotten over the loss of her teenage daughter to cancer, and telling everyone they could about it leading to her financial ruin. This caused her to have anxiety, panic attacks, sleepless nights, and sexual dysfunction that has severely impacted both her personal and professional life.  *See* ECF No. 9 at p. 23, paragraph 141.  These facts are sufficient to constitute IIED.

    c.    <u>The Conspiracy Claim is Proper and Should Not be Dismissed</u>

The Conspiracy claim is based on the coordination of the Defendants amongst themselves to commit the intentional torts of Defamation, Intentional Infliction of Emotional Distress, and the Business Torts.  "Conspiracy is not an independent cause of action in and of itself, but must be premised on an intentional tort." *Rivercard, LLC v. Post Oak Prods., Inc.*, 2013 WL 1908315, at *4 (D. Nev. May 16, 2013). To state a claim for civil conspiracy, the complaint must allege (1) formation and operation of the conspiracy; (2) wrongful act(s) done pursuant thereto; and (3) damage resulting from such act(s). Id. As stated in the Complaint, in order to protect their English Director, Danny D., the Defendants formed a conspiracy to blame Plaintiff for the poisoning of the actress.  *See* ECF No. 9 at p. 16, paragraph 86, and p. 25, paragraph 162.  They conspired to commit the wrongful acts of Defamation, Intentional Infliction of Emotional Distress, and the Business Torts against the Plaintiff.  Plaintiff has been damaged to the tune of millions of dollars in revenue from her adult content because of these actions.

    d.    <u>Plaintiff asks this Court to Allow Her to Amend Her Claims for Intentional Interference with Contractual Relations and Economic Advantage</u>

There are typographical errors in the Claim for Intention Interference with Contractual Relations.  The Defendants are correct when they state, "The heading of Plaintiff's Fifth Cause of Action purports to assert a claim against all Defendants, the allegations refer solely to 'Aylo.' (ECF No. 9 ¶¶ 121-27)."  The Plaintiff will correct the error if given the opportunity to Amend

the Complaint as requested above in the previous section.  The Plaintiff also needs to bolster the claim of Intentional Interference with Economic Advantage as she must add facts regarding the elements of the claims which were unintentionally omitted.

**III.     CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss. In the alternative, Plaintiffs request leave of the Court to conduct jurisdictional discovery and/or amend their First Amended Complaint if the Court finds it deficient in any way.

DATED this 12th day of August, 2024.

KERR SIMPSON ATTORNEYS AT LAW

/s/ George E. Robinson, Esq
P. STERLING KERR, ESQ.
Nevada Bar No. 003978
GEORGE E. ROBINSON, ESQ.
Nevada Bar No. 9667
KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200
Henderson, Nevada 89052
Telephone No. (702) 451–2055
Facsimile No. (702) 451-2077
Email: sterling@kerrsimpsonlaw.com
Email: george@kerrsimpsonlaw.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on August 13, 2024, a true and correct copy of

**PLAINTIFFS' OPPOSITION TO DEFENDANT FRANK PETOSA, RYAN HOGAN AND**

**MICHAEL WOODSIDE'S MOTION TO DISMISS** was served to the following at their last

known address(es), facsimile numbers and/or e-mail/other electronic means, pursuant to:

    \_\_\_X\_\_\_     **BY E-MAIL AND/OR ELECTRONIC MEANS**:  addressees (s) having consented to electronic service, I via e-mail, Electronic Service through the Court's electronic filing system, or other electronic means to the e-mail address(es) of the addressee(s).

Rory T. Kay (NSBN 12416)
John A. Fortin (NSBN 15221)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rkay@mcdonaldcarano.com
jfortin@mcdonaldcarano.com
*Attorneys for Defendants Frank Petosa,*
*Ryan Hogan, and Michael Woodside*

     /s/ Jennifer Hogan
     An employee of the KERR SIMPSON
     ATTORNEYS AT LAW

KERR SIMPSON ATTORNEYS AT LAW
2900 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052
Telephone (702) 451-2055 Facsimile (702) 451-2077